# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL MARSHALL-LIMOGES, <br><br> Defendant. | Case No. 19-CR-4028-LTS-KEM <br><br> **REPORT AND RECOMMENDATION** |

Defendant Michael Marshall-Limoges moves to suppress evidence found in his apartment during the execution of a search warrant, arguing that the search exceeded the scope of the warrant. Docs. 20, 31. He also seeks to suppress statements he made during a custodial interrogation, arguing that officers violated his rights under Iowa Code section 804.20 when they ignored his requests to call his girlfriend. *Id.* The Government resists. Docs. 25, 35. I recommend **denying** the motion to suppress (Doc. 20).

## I. BACKGROUND

On March 22, 2019, at around 8:00 p.m., the Sioux City, Iowa, Police Department received a call about a fourteen-year-old girl who had been walking home from a gas station with her younger brother. A white male in a vehicle had stopped beside the pair and told the girl to get into his car, threatening to harm her brother if she did not. Although the man succeeded in getting the girl into the car, she managed to escape after a struggle, leaving her cell phone in the vehicle.

Officers dispatched to the scene talked with the girl and an adult witness. Through their conversations, they developed a description of the suspect as a white male with face and neck tattoos wearing red shoes and driving a white vehicle that looked like a PT Cruiser or Chevy HHR. Officers saw a person matching this description on the

surveillance footage from the gas station the girl had been at with her brother, which showed the suspect wearing a black baseball hat with a white pattern on the bill, a black polo shirt, glasses with black rims, and a gold necklace (in addition to red sneakers). *See* Doc. 35-6.

Through the Carfax database, Facebook, and surveillance, officers identified Marshall-Limoges as the suspect. They obtained a search warrant for the car, his residence, and his person. *See* Doc. 20-2. The search warrant application requested to search the residence for "items of venue, clothing worn by the suspect during the commission of the crime (to include necklace, unique patterned hat, and red shoes), DNA of the suspect . . . , and the cell phone of the victim." Doc. 20-2 at 4. The search warrant as issued authorized the search of the residence with the handwritten notation "seeking the suspect and matching clothing." *Id.* at 3. The search warrant also authorized the seizure of "DNA belonging to the suspect . . . in the . . . vehicle" and "[a] cellular phone" with a particular phone number (the victim's cell phone). *Id.* at 3.

At around 6:00 a.m. on March 23, 2019, officers went to the apartment Marshall-Limoges shared with his girlfriend to execute the search warrant. Marshall-Limoges's girlfriend answered the door. She told officers that Marshall-Limoges was sleeping in a bedroom. Officers went to the bedroom to arrest Marshall-Limoges and conducted a sweep of the residence to secure it. An officer saw a black polo shirt crumpled near the bed Marshall-Limoges was sleeping in but did not seize it, as the on-scene photographers had not yet arrived. Once the residence was secured, officers called a photographer to the scene to take pictures of evidence before bagging it. An officer testified that they waited to call a photographer until after the residence was secured because it was a weekend day and because of the early hour.

Some officers waited outside with Marshall-Limoges for a squad car to take him to the police station and for a tow truck to tow the car to the police station. Detective Brad Echter testified that he peered through the windows of the car before the tow truck arrived and saw a hat that looked like the one they were looking for.

2

Meanwhile, Detective Sergeant Ryan Bertrand talked with Marshall-Limoges's girlfriend inside in the living room, where a pair of red sneakers were visible (but not seized at that time). The girlfriend told Sergeant Bertrand that Marshall-Limoges had a small gun that he kept in the top drawer of her dresser, "maybe where he keeps his marijuana." Govt. Ex. 1 at 23:27.[1] Upon hearing this, Detective Sergeant Dane Wagner went to the bedroom to check the drawer for a firearm. He opened the drawer, lifted up one article of clothing, and found the firearm. He did not seize the firearm at that time and placed the clothing back where he had found it (but left the drawer open). Sergeant Wagner called the judge who had signed the first warrant, informing him they had found a firearm and asking whether they should obtain a second warrant authorizing its seizure. The judge agreed that they should proceed in that manner.

While Sergeant Wagner looked for the firearm, Sergeant Bertrand continued to talk to Marshall-Limoges's girlfriend. Sergeant Bertrand questioned her about the strong odor of marijuana in the apartment, and after being pressed, she admitted that Marshall-Limoges smoked marijuana and that he "maybe" kept it in the same dresser drawer as the firearm "but she ha[d] no idea." Govt. Ex. 1. Sergeant Wagner returned from the bedroom after finding the firearm and asked Marshall-Limoges's girlfriend if she owned any guns, and she said no. Govt. Ex. 1 at 23:18. Sergeant Bertrand interrupted to repeat what Marshall-Limoges's girlfriend had said earlier about a gun in the drawer. Sergeant Wagner confirmed with the girlfriend that even though her clothes were in the drawer, the firearm belonged to Marshall-Limoges. He asked when she had last seen the gun, and she said maybe a couple of months ago. Sergeant Bertrand testified that he asked these questions to establish that the firearm belonged to Marshall-Limoges, a felon prohibited from possessing firearms, and not to his girlfriend.

Detective Echter left to prepare a second search warrant application requesting to

---

[1] The girlfriend told Sergeant Bertrand this prior to the start of the recording. The recording captures Sergeant Bertrand's summary of what the girlfriend had said twenty minutes earlier.

search for and seize marijuana and firearms in the apartment (based on Marshall-Limoges's girlfriend's statements and the smell of marijuana in the apartment). Sergeant Bertrand went to the police station to continue questioning Marshall-Limoges's girlfriend. Other officers remained on the scene to execute the search warrant once the photographers arrived. Detective Alan Schmeckpeper searched the dresser and seized the firearm. Officers also seized eyeglasses and the polo found next to the bed in the bedroom where Marshall-Limoges had been sleeping. Officers seized two pairs of red sneakers from the living room; one pair was in the open, and one was not (the officers were not sure which pair of red sneakers would match the tread print discovered at the scene of the crime). Officers also discovered a backpack in the closet containing drug paraphernalia and ammunition. As the search was wrapping up, Sergeant Wagner learned from Detective Echter that the second search warrant had been obtained.

After the search of the residence, Sergeant Wagner and Detective Ryan Denney searched the car that had been towed to the station. In the backseat, they found a baseball hat that matched the one the suspect wore on the surveillance footage. They also found a gold necklace that matched the one the suspect wore in the surveillance footage.

On numerous instances after his arrest, Marshall-Limoges made statements suggesting he wanted to call or talk to his girlfriend. When first arrested, Marshall-Limoges stood outside his residence with Detective Denny, Detective Echter, and Officer Casey McBride, waiting for a squad car to take him to the police station. When Marshall-Limoges learned they were waiting for a squad car, he said, "Wait, I thought I got to talk to my girlfriend." Govt. Ex. 15 at 7:00-7:50, 11:34, 12:47. Detective Denney responded that Marshall-Limoges would not be allowed to talk to his girlfriend until after the officers talked with him at the station. *Id.* Officer McBride stated Marshall-Limoges could call his girlfriend once he arrived at the jail. *Id.* Marshall-Limoges asked the officers to get his girlfriend's phone number, and they agreed. *Id.* Later, Marshall-Limoges asked the officers if his girlfriend had come outside (they said she was still inside talking to officers), and later still, Marshall-Limoges reminded the officer to get

4

his girlfriend's phone number for him.  *Id.*

During Marshall-Limoges's interrogation at the police station, he repeatedly asked the officers interviewing him for his girlfriend's phone number.  *See* Govt. Ex. 8 at 8:06:57, 8:59:30, 9:40:13, 10:37:20, 10:55:16, 11:06:30; *see also* Doc. 38 at 11-12, 38-40; Doc. 38-1 at 4-8, 15, 26-27.  He noted that he was "going to have to call her"; that he needed the number so that he could call her from jail and make sure she knew how to contact a bondsman; that he "want[ed] to make sure she doesn't hate [him]"; that he thought he knew her number but wanted to make sure; and that he "want[ed] to talk to [his] girl."  *Id.*  During one of his requests, he asked for the number to be written down so he could take it to jail with him.  *Id.*  He also asked when he would receive his phone call, and officers told him once he arrived at the jail.  *Id.*

I held a hearing on the suppression motion on October 8, 2019.  Doc. 37.  The following witnesses, all with the Sioux City Police Department, testified at the hearing:

- Sergeant Bertrand;
- Detective Denney;
- Sergeant Wagner;
- Detective Schmeckpeper;
- Detective Nathan Niehus;
- Officer McBride; and
- Detective Echter.

I also admitted the following exhibits into evidence:

- Defendant Exhibit A – first search warrant (Doc. 20-2);
- Defendant Exhibit B – second search warrant (Doc. 20-3);
- Defendant Exhibits C - G – photographs taken during the execution of the search warrant (Docs. 39-1 to 39-5);
- Government Exhibit 1 – audio recording of interview with Defendant's girlfriend at the residence during the execution of the search warrant;
- Government Exhibit 8 – video recording of Defendant's interrogation;
- Government Exhibits 8a and 8b – transcript of video recording of Defendant's interrogation (Docs. 38, 38-1);
- Government Exhibits 10 - 14 – photographs taken in Defendant's bedroom during the execution of the search warrant (Docs. 35-1 to 35-5);
- Government Exhibit 15 – audio recording of statements Defendant made

5

outside his residence while waiting to be transported to the police station;
- Government Exhibit 16 – still image of suspect taken from the gas station surveillance footage (Doc. 35-6);
- Government Exhibit 17 – Detective Echter's property sheet of evidence seized during the execution of the search warrant (Doc. 35-7);
- Government Exhibit 18 – Detective Denney's property sheet of evidence seized during the execution of the search warrant (Doc. 35-8); and
- Government Exhibit 19 – text of Iowa Code section 804.20 (Doc. 38-2).[2]

## *II. SCOPE OF THE SEARCH WARRANT*

Marshall-Limoges argues that the search of his residence exceeded the scope of the first search warrant. "If the scope of the search exceeds that permitted by the terms of a validly issued warrant . . . , the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990). "A lawful search extends to all areas and containers in which the object of the search may be found." *United States v. Weinbender*, 109 F.3d 1327, 1329 (8th Cir. 1997).[3]

Marshall-Limoges argues that as soon as officers discovered the red shoes and black polo, the object of the first search warrant had been completed, and any further search of the residence exceeded the scope of the warrant. In particular, he takes issue with the officers looking inside the dresser drawer and a backpack found in a bedroom closet after they had already found the shoes and polo shirt.[4]

---

[2] Prior to the hearing, the Government submitted (and I reviewed) the police reports of the witnesses who ended up testifying at the hearing. Docs. 25-1 to 25-7. The defense objected to the admission of the police reports as evidence, and the Government withdrew the offer of the evidence (therefore, I did not rule on the admissibility of the police reports).

[3] The parties dispute who bears the burden of proving that a search exceeded the scope of the warrant. *See United States v. Crawford*, 220 F. Supp. 3d 931, 936-37 (W.D. Ark. 2016) (recognizing that "the burden of proof for an allegation that the Government exceeded the scope of a search warrant does not appear to be clearly developed in the Eighth Circuit" and holding that the defendant "has the initial burden to show that the search exceeded the scope of the warrant, and if met, the Government would have to show that the evidence it seeks to introduce did not flow from that illegality"). Because I find that the Government has proven that the search did not exceed the scope of the warrant, I need not resolve who bears the burden of proof.

[4] The defense implied that the officers should have stopped searching once they saw the shoes

The first search warrant authorized officers to search Marshall-Limoges's residence for clothing matching that of the suspect's and the victim's cell phone. Doc. 20-2 at 4. The application in support of the warrant specifically described the matching clothing as including a "necklace, unique patterned hat, and red shoes."[5] Officers did not seize or even see the necklace until after the completion of the search of the residence (it was found in the car, which was searched after the residence). Thus, officers did not exceed the scope of the search warrant when they looked in a dresser drawer and the backpack in the bedroom closet, as the necklace could have been found in those places. Although two cell phones were seized from the residence (*see* Doc. 17), it is not clear officers ever located the victim's cell phone. Officers confirmed with Marshall-Limoges's girlfriend that the cell phones seized belonged to Marshall-Limoges. *See* Govt. Ex. 1 at 24:30. Sergeant Wagner testified the victim's cell phone was not found in the residence. The officers could also reasonably look in the dresser and backpack for the victim's cell phone. Once they saw drugs, drug paraphernalia, and a firearm they knew belonged to Marshall-Limoges, a felon, they could seize those items under the plain-view exception to the warrant requirement (even before the second search warrant was obtained). *See United States v. Hughes*, 940 F.2d 1125, 1126-27 (8th Cir. 1991).

I recommend that the district court **deny** Defendant's motion to suppress with respect to evidence seized in accordance with the search warrant.

### III. *VIOLATION OF STATE-LAW RIGHTS DURING INTERROGATION*

Under Iowa Code section 804.20, "[a]ny peace officer . . . having custody of any

---

and polo shirt but cites no authority for that proposition. It is reasonable for officers to search to locate all items listed in the search warrant, rather than stopping after locating one or two items.

[5] I disagree with Defendant's reading of the handwritten notation on the search warrant as attempting to limit the officers' search to only clothing (as opposed to jewelry). It appears the notation meant to specify that the clothing described in the application (including the necklace) could be seized, but not the Defendant's DNA or "items of venue," as initially requested in the search warrant application.

person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call . . . a member of the person's family . . . ." Marshall-Limoges argues that officers violated his rights under this statute when he requested his girlfriend's phone number and stated that he wanted to talk to her, and officers ignored or denied his request.

In *Elkins v. United States*, 364 U.S. 206, 210, 223-24 (1960), the Supreme Court (overruling prior precedent) held that evidence seized by state officers in violation of the defendant's Fourth Amendment rights is inadmissible in a federal criminal trial. The Supreme Court instructed:

> In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

*Id.* at 224-25. This principle extends outside the Fourth Amendment context: "that . . . statements were obtained by state officers, even if arguably in violation of a state statute, does not render them inadmissible in [a] federal proceeding unless those statements were obtained in violation of the federal constitutional standards applying[—]the Fifth and Sixth Amendments." *United States v. Ramsey*, 367 F. Supp. 1307, 1314 (W.D. Mo. 1973); *see United States v. Garecht*, No. 13-30038, 2013 WL 5951380, at *4-5 n.3 (C.D. Ill. Nov. 7, 2013) (noting that "[f]ederal law controls the admissibility of evidence in federal court" and holding that violation of state statute requiring the consent of all parties to a recording was irrelevant to the admissibility of a recorded conversation in federal criminal case); *United States v. Faultry*, No. CRIM. H-05-00109, 2006 WL 1544512, at *3-4 (S.D. Tex. June 1, 2006) (holding that state officer's failure to record defendant's interrogation, in violation of state rule of criminal procedure, did not require suppression in federal court); *see also United States v. Bruce*, 550 F.3d 668, 673 (7th Cir. 2008) ("Assuming that [the state officer] violated state law by turning off the recorder, that

violation was irrelevant in this federal case. Federal law, not state law, governs the admissibility of evidence in federal criminal trials, and there is no federal requirement that criminal interrogations be recorded.").

Marshall-Limoges does not argue that his constitutional rights under *Miranda* were violated—although he suggests that officers violated his Fifth Amendment rights by failing to allow him to call his girlfriend, he recognizes that the rights under Iowa Code section 804.20 are "additional protections given by Iowa." Doc. 31 at 4. Marshall-Limoges does not argue that any of his rights under federal law were violated—constitutional or otherwise. The Supreme Court has declined to interpret federal constitutional violations in light of state law, reasoning:

> [L]inking Fourth Amendment protections to state law would cause them to "vary from place to place and from time to time." . . . [W]hile States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.

***Virginia v. Moore***, 553 U.S. 164, 172-73, 176 (2008) (quoting ***Whren v. United States***, 517 U.S. 806, 815 (1996)); *see also* ***United States v. Bautista-Ramos***, No. 18-CR-4066-LTS, 2018 WL 5726236, at *8-9 (N.D. Iowa Oct. 15, 2018) (collecting cases holding that suppression is not an appropriate remedy when a federal agent's arrest of defendant exceeds his or her statutory authority because "[t]here is no exclusionary rule generally applicable to statutory violations"), *report and recommendation adopted*, 2018 WL 5723948 (Nov. 1, 2018).

Marshall-Limoges argues that the violation of the state statute in this case should result in suppression because the officers intentionally and deliberately violated the statute and the violation was prejudicial to Marshall-Limoges (arguing state case law provides violations of that statute are presumed prejudicial). He relies on *United States v. Freeman*, 897 F.2d 346 (8th Cir. 1990), and *United States v. Hansen*, No. CR13-3010-MWB, 2013 WL 3199988 (N.D. Iowa June 19, 2013), *report and recommendation adopted*, 2013 WL 3940632 (July 31, 2013). In those cases, the courts recognized that "non-fundamental" violations of a state procedural rule (meaning an intentional or

9

deliberate violation or a prejudicial violation "in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed") could warrant suppression of evidence. *Hansen*, 2013 WL 3199988, at *8 (quoting *Freeman*, 897 F.2d at 350). The courts addressed the circumstances meriting suppression when evidence is seized under a state search warrant obtained by a state officer who lacked the authority to apply for a search warrant under state law. *Freeman*, 897 F.2d at 348-49; *Hansen*, 2013 WL 3199988, at *7-9. In reaching its holding that suppression may be appropriate in some circumstances, the Eighth Circuit recognized that under federal law, the "person[] applying for a warrant must possess lawful authority." *Freeman*, 897 F.2d at 348. Thus, these cases can perhaps be distinguished as involving federal law and violations of Federal Rule of Criminal Procedure 41. *See id.* at 349. I also note that the Eighth Circuit decided *Freeman* before the Supreme Court's decision in *Virginia v. Moore*, in which the Supreme Court held that state officers did not violate the Fourth Amendment by arresting the defendant for driving with a suspended license, even though state law did not authorize arrest in such circumstances; rather, the court held, the general reasonableness standard of the Fourth Amendment, not state law, controlled. 553 U.S. at 166-67, 176. In any event, the type of violation of state law at issue in *Freeman* and *Hansen* differs from the type of violation here. As the court in *Hansen* recognized, the Eighth Circuit has not extended *Freeman* outside the context of a state officer lacking authority to obtain a warrant, instead repeatedly holding that the violation of state law is irrelevant in a federal prosecution. 2013 WL 3199988, at *6-7 (citing *United States v. Cotes*, 569 F.3d 391, 393 (8th Cir. 2009) (holding irrelevant violation of state law requiring judge to record supplemental testimony given in support of a search warrant); *United States v. Koch*, 625 F.3d 470, 476 n.3 (8th Cir. 2010) (holding irrelevant violation of state law requiring execution of search warrant within ten days of its issuance)).

    In this federal prosecution, the admissibility of Marshall-Limoges's statements depends on whether his rights under the United States Constitution, not Iowa state law,

were violated. Accordingly, I recommend that Marshall-Limoges's motion to suppress be **denied**.

### IV. CONCLUSION

I respectfully recommend **denying** the motion to suppress (Doc. 20).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. **LCrR 59**. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* **Fed. R. Crim. P. 59**. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

DATED this 11th day of December, 2019.

*/s/ Kelly K.E. Mahoney*
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa