## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. CR19-4028-LTS |
| vs. | | |
| MICHAEL MARSHALL-LIMOGES, | | **ORDER ON REPORT AND RECOMMENDATION** |
| Defendant. | | |

## I.    INTRODUCTION

This matter is before me on a Report and Recommendation (R&R) by the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge.  Doc. No. 43. Judge Mahoney recommends that I deny defendant Michael Marshall-Limoges' motion (Doc. No. 20) to suppress evidence.  Marshall-Limoges argues that evidence should be suppressed because police officers (1) exceeded the scope of their search warrant and (2) violated his rights to speak with a family member under Iowa Code § 804.20.  Doc. No. 20.

## II.    BACKGROUND

### A.    Procedural History

On May 23, 2019, a grand jury returned an indictment (Doc. No. 1) charging Marshall-Limoges with one count of kidnapping under 18 U.S.C. § 1201(a)(1) and (d) and one count of possession of a firearm by a felon under 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Marshall-Limoges filed his motion (Doc. No. 20) to suppress on September 10, 2019.  The Government filed a resistance (Doc. No. 25) on September 24, 2019, and Marshall-Limoges filed a reply (Doc. No. 31) on October 2, 2019.

Judge Mahoney held an evidentiary hearing on the motion on October 25, 2019. During the hearing, Judge Mahoney received Government's Exhibits 1, 8, 8a, 8b and 10 through 18 and Marshall-Limoges' Exhibits A through G into evidence.[1] She issued her R&R (Doc. No. 43) on December 11, 2019. Marshall-Limoges filed an objection (Doc. No. 55) to the R&R on February 28, 2020, and the Government filed a resistance (Doc. No. 58) on March 19, 2020.

## B.    *Relevant Facts*

Judge Mahoney made the following findings of fact:

On March 22, 2019, at around 8:00 p.m., the Sioux City, Iowa, Police Department received a call about a fourteen-year-old girl who had been walking home from a gas station with her younger brother. A white male in a vehicle had stopped beside the pair and told the girl to get into his car, threatening to harm her brother if she did not. Although the man succeeded in getting the girl into the car, she managed to escape after a struggle, leaving her cell phone in the vehicle.

Officers dispatched to the scene talked with the girl and an adult witness. Through their conversations, they developed a description of the suspect as a white male with face and neck tattoos wearing red shoes and driving a white vehicle that looked like a PT Cruiser or Chevy HHR. Officers saw a person matching this description on the surveillance footage from the gas station the girl had been at with her brother, which showed the suspect wearing a black baseball hat with a white pattern on the bill, a black polo shirt, glasses with black rims, and a gold necklace (in addition to red sneakers). *See* Doc. 35-6.

Through the Carfax database, Facebook, and surveillance, officers identified Marshall-Limoges as the suspect. They obtained a search warrant for the car, his residence, and his person. *See* Doc. 20-2. The search warrant application requested to search the residence for "items of venue, clothing worn by the suspect during the commission of the crime (to include

---

[1] For the sake of consistency with the R&R and the parties' briefs, I will refer to any exhibits using the numbers and letters assigned by the parties, rather than by their docket numbers.

necklace, unique patterned hat, and red shoes), DNA of the suspect . . . , and the cell phone of the victim." Doc. 20-2 at 4. The search warrant as issued authorized the search of the residence with the handwritten notation "seeking the suspect and matching clothing." *Id.* at 3. The search warrant also authorized the seizure of "DNA belonging to the suspect . . . in the . . . vehicle" and "[a] cellular phone" with a particular phone number (the victim's cell phone). *Id.* at 3.

At around 6:00 a.m. on March 23, 2019, officers went to the apartment Marshall-Limoges shared with his girlfriend to execute the search warrant. Marshall-Limoges's girlfriend answered the door. She told officers that Marshall-Limoges was sleeping in a bedroom. Officers went to the bedroom to arrest Marshall-Limoges and conducted a sweep of the residence to secure it. An officer saw a black polo shirt crumpled near the bed Marshall-Limoges was sleeping in but did not seize it, as the on-scene photographers had not yet arrived. Once the residence was secured, officers called a photographer to the scene to take pictures of evidence before bagging it. An officer testified that they waited to call a photographer until after the residence was secured because it was a weekend day and because of the early hour.

Some officers waited outside with Marshall-Limoges for a squad car to take him to the police station and for a tow truck to tow the car to the police station. Detective Brad Echter testified that he peered through the windows of the car before the tow truck arrived and saw a hat that looked like the one they were looking for.

Meanwhile, Detective Sergeant Ryan Bertrand talked with Marshall-Limoges's girlfriend inside in the living room, where a pair of red sneakers were visible (but not seized at that time). The girlfriend told Sergeant Bertrand that Marshall-Limoges had a small gun that he kept in the top drawer of her dresser, "maybe where he keeps his marijuana." Govt. Ex. 1 at 23:27. Upon hearing this, Detective Sergeant Dane Wagner went to the bedroom to check the drawer for a firearm. He opened the drawer, lifted up one article of clothing, and found the firearm. He did not seize the firearm at that time and placed the clothing back where he had found it (but left the drawer open). Sergeant Wagner called the judge who had signed the first warrant, informing him they had found a firearm and asking whether they should obtain a second warrant authorizing its seizure. The judge agreed that they should proceed in that manner.

While Sergeant Wagner looked for the firearm, Sergeant Bertrand continued to talk to Marshall-Limoges's girlfriend. Sergeant Bertrand questioned her about the strong odor of marijuana in the apartment, and after being pressed, she admitted that Marshall-Limoges smoked marijuana and that he "maybe" kept it in the same dresser drawer as the firearm "but she ha[d] no idea." Govt. Ex. 1. Sergeant Wagner returned from the bedroom after finding the firearm and asked Marshall-Limoges's girlfriend if she owned any guns, and she said no. Govt. Ex. 1 at 23:18. Sergeant Bertrand interrupted to repeat what Marshall-Limoges's girlfriend had said earlier about a gun in the drawer. Sergeant Wagner confirmed with the girlfriend that even though her clothes were in the drawer, the firearm belonged to Marshall-Limoges. He asked when she had last seen the gun, and she said maybe a couple of months ago. Sergeant Bertrand testified that he asked these questions to establish that the firearm belonged to Marshall-Limoges, a felon prohibited from possessing firearms, and not to his girlfriend.

Detective Echter left to prepare a second search warrant application requesting to search for and seize marijuana and firearms in the apartment (based on Marshall-Limoges's girlfriend's statements and the smell of marijuana in the apartment). Sergeant Bertrand went to the police station to continue questioning Marshall-Limoges's girlfriend. Other officers remained on the scene to execute the search warrant once the photographers arrived. Detective Alan Schmeckpeper searched the dresser and seized the firearm. Officers also seized eyeglasses and the polo found next to the bed in the bedroom where Marshall-Limoges had been sleeping. Officers seized two pairs of red sneakers from the living room; one pair was in the open, and one was not (the officers were not sure which pair of red sneakers would match the tread print discovered at the scene of the crime). Officers also discovered a backpack in the closet containing drug paraphernalia and ammunition. As the search was wrapping up, Sergeant Wagner learned from Detective Echter that the second search warrant had been obtained.

After the search of the residence, Sergeant Wagner and Detective Ryan Denney searched the car that had been towed to the station. In the backseat, they found a baseball hat that matched the one the suspect wore on the surveillance footage. They also found a gold necklace that matched the one the suspect wore in the surveillance footage.

On numerous instances after his arrest, Marshall-Limoges made statements suggesting he wanted to call or talk to his girlfriend. When first

4

arrested, Marshall-Limoges stood outside his residence with Detective Denny, Detective Echter, and Officer Casey McBride, waiting for a squad car to take him to the police station. When Marshall-Limoges learned they were waiting for a squad car, he said, "Wait, I thought I got to talk to my girlfriend." Govt. Ex. 15 at 7:00-7:50, 11:34, 12:47. Detective Denney responded that Marshall-Limoges would not be allowed to talk to his girlfriend until after the officers talked with him at the station. *Id.* Officer McBride stated Marshall-Limoges could call his girlfriend once he arrived at the jail. *Id.* Marshall-Limoges asked the officers to get his girlfriend's phone number, and they agreed. *Id.* Later, Marshall-Limoges asked the officers if his girlfriend had come outside (they said she was still inside talking to officers), and later still, Marshall-Limoges reminded the officer to get his girlfriend's phone number for him. *Id.*

During Marshall-Limoges's interrogation at the police station, he repeatedly asked the officers interviewing him for his girlfriend's phone number. *See* Govt. Ex. 8 at 8:06:57, 8:59:30, 9:40:13, 10:37:20, 10:55:16, 11:06:30; *see also* Doc. 38 at 11-12, 38-40; Doc. 38-1 at 4-8, 15, 26-27. He noted that he was "going to have to call her"; that he needed the number so that he could call her from jail and make sure she knew how to contact a bondsman; that he "want[ed] to make sure she doesn't hate [him]"; that he thought he knew her number but wanted to make sure; and that he "want[ed] to talk to [his] girl." *Id.* During one of his requests, he asked for the number to be written down so he could take it to jail with him. *Id.* He also asked when he would receive his phone call, and officers told him once he arrived at the jail. *Id.*

Doc. No. 43 at 1–5 (footnote omitted).

## III.   APPLICABLE STANDARDS

A district judge must review a magistrate judge's R&R under the following standards:

Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive

further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## IV.    DISCUSSION

Marshall-Limoges argues that (1) the firearm, marijuana, ammunition and drug paraphernalia discovered during the search should be suppressed because the officers exceeded the scope of their search warrant by continuing to search after discovering items of clothing specified in the warrant and (2) statements made during his interrogation should be suppressed because officers violated Iowa Code § 804.20 by denying, or unreasonably delaying, an opportunity to speak with or call his girlfriend after he requested to do so. Doc. No. 20. Judge Mahoney recommends that I deny the motion

on both grounds. Doc. No. 43 at 11. She found that the officers did not exceed the scope of the search warrant because (1) there were other items specified in the warrant they had not yet found (cell phone, necklace, hat) that could have been in the places they continued to search (dresser drawers, backpack) and (2) their subsequent seizure of drug paraphernalia and a firearm were protected under the plain-view exception to the warrant requirement. *Id.* at 6–7. She also found that regardless of whether the police officers violated Marshall-Limoges' rights under Iowa Code § 804.20, such violation would be irrelevant to the current federal prosecution because it would not constitute a violation of his rights under the United States Constitution. *Id.* at 9–10.

Marshall-Limoges objects only to Judge Mahoney's finding as to Iowa Code § 804.20. Doc. No. 55 at 1. I have reviewed for clear error Judge Mahoney's conclusion regarding the scope of the search warrant. I find no error as to that conclusion. Thus, I will address only the alleged violation of Iowa Code § 804.20.

Marshall-Limoges argues that evidence obtained by interrogation after his requests to speak with his girlfriend were denied should be suppressed because the denials were intentional and deliberate violations of Iowa Code § 804.20. Doc. No. 55 at 1–2. According to Marshall-Limoges, Judge Mahoney erred by finding that any violation of § 804.20 would be irrelevant to the federal prosecution and declining to determine whether the officers violated the statute. *Id.* at 2–6. Relying on *United States v. Freeman*, 897 F.2d 346 (8th Cir. 1990), he argues that a violation of a state statute that recognizes a fundamental right, even if it does not constitute a violation of rights secured by the United States Constitution, can result in the suppression of evidence in a federal prosecution when the violation was intentional and deliberate. *Id.* at 8–10.

Judge Mahoney found that any potential violation of Iowa Code § 804.20 is irrelevant to the admissibility of evidence in this federal prosecution. Doc. No. 43 at 8–10. She noted that federal courts have consistently held that federal law, not state law, governs the admissibility of evidence in federal prosecutions and Marshall-Limoges does not claim that any federal right was violated. *Id.* at 9–10. Instead, Marshall-Limoges

relies on *Freeman* for the proposition that the exclusionary rule extends to state law violations in some circumstances. *Id.* at 8–9. Judge Mahoney concluded, however, that to whatever extent *Freeman* represents an exception to the rule limiting the exclusionary rule to violations of federal constitutional rights, it does not apply here. *Id.* at 9–10.

Based on my de novo review, I agree with Judge Mahoney. The Supreme Court and Eighth Circuit have held that federal law governs the legality of law enforcement's actions, and the ultimate admissibility of evidence, in federal prosecutions. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008); *United States v. Koch*, 625 F.3d 470, 476 n.3 (8th Cir. 2010); *United States v. Cote*, 569 F.3d 391, 393 (8th Cir. 2009). Accordingly, officers' violations of state laws that do not constitute violations of federal laws or of federal constitutional rights do not compel the suppression of evidence in a federal prosecution. While *Freeman* does suggest that there may be circumstances in which law enforcement's failure to comply with state law is relevant, and might require the exclusion of evidence, such circumstances do not exist here.

The issue in *Freeman* was whether to extend the exclusionary rule to procedural violations of warrant requirements that "do not implicate the constitutional values of probable cause or description with particularity of the place to be searched and the items seized." *Freeman*, 897 F.2d at 348–50. The warrant at issue was a search warrant issued by a state court judge. *Id.* at 347. The state officer who applied for and obtained the warrant held a position that was not within the state's statutory definition of a peace officer who was empowered to apply for a search warrant. *Id.* Thus, the warrant was not validly issued under state law. Nonetheless, it was executed and various items of evidentiary value were located. *Id.*

In a subsequent federal prosecution, the defendant sought to suppress the evidence gathered during execution of the state court search warrant. *Id.* The court of appeals, in reviewing the district court's denial of the motion to suppress, based its analysis in federal law, namely, similar violations of Federal Rule of Criminal Procedure 41. *Id.* at 348 ("[I]t makes little difference whether we evaluate the validity of the warrant

application under state law . . . or under the traditional notion that a warrant underlying a federal conviction must be examined in light of federal standards" because "[b]oth federal and state law congruently require that persons applying for a warrant must possess lawful authority."). Ultimately, the court concluded that a procedural violation of Rule 41, or of a state law analog, that did not otherwise violate the Fourth Amendment could nonetheless require suppression, but only if the violation was intentional and deliberate or prejudiced the defendant. *Id.* at 350.

Although *Freeman* employed the suppression test for Rule 41 violations to analyze the violation of state law procedural requirements, I find that conducting such an analysis with regard to the state law at issue here is neither required nor appropriate. I have found no case extending *Freeman* beyond the issue of whether a search warrant was validly obtained. Indeed, the Eighth Circuit has not been inclined to invoke *Freeman* when addressing violations of state procedural requirements that do not also constitute a violation of federal law or implicate the question of *authority to obtain* the warrant. *See Koch*, 625 F.3d at 476 & n.3 (warrant executed outside of time frame permitted under state statute would not result in suppression "because the legality of a search and seizure in a federal prosecution is determined by federal law even if the person conducting a search were state actors"); *Cote*, 596 F.3d at 393 (a violation of state law requiring an abstract of witness testimony for issuance of warrant, but was not a violation of Rule 41, did not result in suppression because it did not conflict with the Fourth Amendment); *United States v. Timley*, 443 F.3d 615, 624 (8th Cir. 2006) ("[A] procedural violation of state or federal law in *securing* a warrant ought not result in suppression of evidence unless the law was either deliberately violated, or the defendant was prejudiced by the violation . . . ." (emphasis added)); *United States v. Bach*, 310 F.3d 1063, 1066 (8th Cir. 2002) (violation of state statutes regarding the execution of warrants did not warrant suppression, where no federal law was violated, because "federal courts in federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment"); *United States v.*

*Hellbusch*, 48 F.3d 1225 (Table), 1995 WL 94714, at *2 (8th Cir. March 9, 1995) (defendant's claim that officers lacked authority to execute warrant in another county failed because he did "not allege[] any violation of federal law"); *United States v. Bieri*, 21 F.3d 811, 816 (8th Cir. 1994) ("[W]e need not decide whether the warrant violated Missouri law since we conclude the district court did not err in finding the search warrant was constitutionally valid."). Thus, I will not apply the *Freeman* analysis to an issue that is completely unrelated to the process of obtaining a warrant.

In addition, *Freeman* recognized that the distinction between state and federal law was not significant in that case because both state and federal law shared the requirement that the official obtaining a warrant be authorized to do so. *Freeman*, 897 F.2d at 348. Here, however, Iowa Code § 804.20 grants a right (the right to call a family member while in custody) that is wholly unrecognized under federal law. To allow this state law requirement to set the standard in a federal prosecution would be contrary to well-established federal law. *See Moore*, 553 U.S. at 176 ("[L]inking Fourth Amendment protections to state law would cause them to "vary from place to place and from time to time" . . . . [W]hile States are free to regulate such arrests however they desire, state restrictions do not alter the [Constitution's] protections." (citations omitted)); *United States v. Moore*, 956 F.2d 843, 847 (8th Cir. 1992) ("[S]tates are not free to impose on Federal courts requirements more strict than those of the Federal laws or Constitution." (citation omitted)).

In short, Marshall-Limoges has not shown that his rights under federal law, or under the United States Constitution, were violated when his request to call his girlfriend was denied or delayed. Because any possible violation of Iowa Code § 804.20 would not warrant the suppression of evidence in this federal prosecution, I need not decide whether a violation of § 804.20 actually occurred. Marshall-Limoges' objection will be overruled.

### V.    CONCLUSION

For the reasons set forth herein:

1.      Marshall-Limoges' objection (Doc. No. 55) to the Report and Recommendation (Doc. No. 43) is **overruled** and I **accept** the Report and Recommendation **without modification**.

2.      Pursuant to Judge Mahoney's recommendation, Marshall-Limoges' motion to suppress (Doc. No. 20) is **denied**.

**IT IS SO ORDERED.**

**DATED** this 14th day of April, 2020.

_____
Leonard T. Strand, Chief Judge